■ In the Matter of FLORENCE ELLSMAN. MARILYN BLAINE, Appellant; JAMES RUDOLPH, Respondent.—In a proceeding pursuant to Mental Hygiene Law article 78 to compel an accounting, the committee for adjudged incompetent Florence Ellsman appeals from so much of an order of the Supreme Court, Kings County (Leone, J.), dated April 3, 1989, as denied its application for an accounting from James Rudolph.

Ordered that the order is reversed insofar as appealed from,

on the law, with costs, and the committee's application for an accounting is granted.

Florence Ellsman and her sister Gladys Rudolph lived together for many years in a house owned by Florence located in Richmond County. The sisters maintained a joint bank account into which Florence deposited her pension and Social Security checks and from which Gladys paid Florence's bills. In 1984 Florence deeded the Richmond County property to Gladys, who died the following year. Shortly after Gladys' death her children and sole heirs, of which James Rudolph was one, deeded the property to themselves.

In December 1985 Charlotte Swirz, one of Florence's nieces, commenced a proceeding seeking a declaration that Florence was incompetent by virtue of mental illness and the appointment of a committee to care for her and manage her property. It was alleged that Florence's property, particularly her Richmond County home, may have been invalidly transferred during the period of her mental incompetence.

Ultimately Florence's nieces and nephew executed a document denominated a stipulation of settlement, which declared Florence to be incompetent and provided for the appointment of Marilyn Blaine, another of Florence's nieces, as her committee. The stipulation further provided that the Richmond County home was to be transferred back to Florence, but that the nieces and nephew would share the proceeds of its ultimate sale upon Florence's death. It was further stipulated that "since the death of his Mother, Gladys Rudolph on February 16th, 1985, James Rudolph has handled the financial affairs of FLORENCE ELLSMAN". Thus, it was further provided that James was to provide "an accounting of the money and assets received and the expenses made on [Florence's] behalf by him or anyone else in his behalf". This stipulation was incorporated into an order of appointment.

By order to show cause dated August 25, 1988, Marilyn Blaine, the committee for Florence, commenced the instant proceeding, subsequently delineated a proceeding pursuant to Mental Hygiene Law § 78.19 (a), by which she sought an order requiring James to account for "all monies and other assets in his possession obtained directly or indirectly or over which he exercised dominion and control from FLORENCE ELLSMAN, including but not limited to monies obtained from individual savings, checking or money market accounts in the name of GLADYS RUDOLPH, now deceased and/or joint accounts in the name of GLADYS RUDOLPH, now deceased and JAMES RUDOLPH

and GLADYS RUDOLPH, now deceased and FLORENCE ELLSMAN". That application was ultimately denied, and this appeal ensued.

Both the Supreme Court and our dissenting colleague are of the opinion that Marilyn Blaine failed to meet her burden of establishing that the document denominated a stipulation of settlement should be set aside. We conclude, however, that there is no need to decide that issue since the instant application is not barred under the express terms of that stipulation. The December 1985 application for the appointment of a committee focused upon the transfer of Florence's Richmond County home to Gladys and its subsequent transfer to Gladys' children, including her son James. As the above-quoted portion of the stipulation makes clear, the accounting to which James consented thereunder involved his handling of Florence's financial affairs after his mother's death. By contrast, the instant proceeding concerns the handling of Florence's financial affairs by James' mother prior to her death, and concerns James only by virtue of the fact that he came into possession of funds after the death of his mother which it is alleged she had wrongfully appropriated. In fact, the dissent concedes that the instant application "was based upon allegations that * * * Gladys misappropriated her sister's funds during her lifetime and that those funds had largely come into James' hands" (Miller, J., dissenting, at 1). This is in contrast to the stipulation, which involves Florence's real property and funds which were still in Florence's name at the time of her sister's death. In short, the allegations at issue here were neither raised in the prior proceeding nor covered by the stipulation. Thus the instant application cannot be denied on this basis.

We further find that the committee established reasonable grounds to believe that property belonging to Florence is under the control of James such that an accounting is warranted (see, Mental Hygiene Law § 78.19 [a]). These grounds are established principally by the affidavit of Marilyn Blaine, as supported by documentary evidence, which tracks funds that were originally deposited in the account of Florence and her late husband and wound up in either a joint account in the names of Gladys and her son James or in the personal checking account of James. At the time of the alleged misappropriations, Florence's account contained funds in excess of $95,000. Evidence was also submitted tending to establish that at the time of these transactions Florence was not in complete control of her faculties.

In light of the foregoing, the application to compel James to account for the moneys in his possession or over which he exercises dominion and control which were obtained directly or indirectly from Florence should have been granted. Thompson, J. P., Brown and Eiber, JJ., concur.

Miller, J. (dissenting). I respectfully dissent and disagree with my colleagues' conclusion that there is no need to decide whether the stipulation should be set aside, in that the instant application is not barred under the "express terms" of the stipulation. On the contrary, I find that the majority's narrow interpretation of the stipulation is not supported by the evidence. I find that the stipulation was intended to settle the dispute pertaining to all transfers of property and funds by Florence to Gladys from 1983 to 1985, and that the instant proceeding should therefore be barred by the stipulation.

Both proceedings are concerned with the question of Florence's mental incompetency at the time of transfer of property to her sister Gladys from 1983 to 1984. While the first proceeding dealt specifically with the transfer of Florence's home in February 1984, and the second proceeding concerned other earlier transfers of Florence's funds held jointly with Gladys in 1983, the essential issue was the same. Was Florence incompetent when, in 1983 and 1984, her money and property were transferred to her sister Gladys, causing these transfers to be invalid?

The subject appeal concerns a dispute between seven nieces and a nephew over funds conveyed by their elderly aunt, Florence, to her younger sister, Gladys, during 1983-1984. Florence, the original owner of the funds, now an approximately 87-year-old childless widow in the advanced stages of Alzheimer's disease, resides in a nursing home. Gladys, until her death in February 1985, lived with her sister Florence for years in Florence's home and was her acknowledged companion and housekeeper. In 1982 Florence transferred her savings and monthly income into a joint account with Gladys from which Gladys paid all Florence's expenses. Allegedly, in 1983, Gladys withdrew substantial funds from the joint account with her sister and deposited them into a joint account with her son James. In 1984, prior to Gladys' death, Florence deeded over her home to her sister (allegedly because she was childless with no close family while Gladys had children). Gladys died in 1985 and upon her death, her son James Rudolph (with his two sisters) inherited the house. James was substituted for his mother on the joint account with his

elderly aunt, and continued to maintain and provide for Florence's care while she remained domiciled in the house.

In the first proceeding commenced in December 1985, a niece of Florence, Charlotte Swirz, acting for herself and four remaining nieces, sought appointment of a committee for the person and property of Florence, and to enjoin any transfer or conveyance of the house by James and his sisters. While specific reference to prior transfers of funds from Florence to Gladys was not made in the first proceeding, it appears that the petitioner Marilyn Blaine must have had some knowledge of the prior transfers at the February 1986 hearing in that first proceeding before Justice Leone. A psychiatrist who examined Florence late in November 1985, testified that she was, in 1985, and at the time of the hearing in 1986, incompetent and that her mental condition was likely to deteriorate further. The petitioner's counsel then sought to elicit opinion testimony from the doctor regarding Florence's competency in years prior to the date of his examination in 1985. The sole relevance of that inquiry would have been to ascertain whether earlier transfers of assets from Florence to Gladys had been made when Florence was incompetent. James' objection was sustained, and the proceeding was interrupted in order to afford James an opportunity to obtain his own expert inasmuch as he had no notice that his aunt's mental capacity in years prior to 1985 affecting transfers of other property would be in issue. However, the question of Florence's mental capacity at the time of the transfers, which was directly before the court in the first proceeding, was never explored, since a few months after the adjourned hearing, the parties, including the instant petitioner, entered into the stipulation of settlement which is in issue here. I find that when the stipulation was executed the parties waived their opportunity to litigate the issue of Florence's competence at the time of the transfers of her funds and home to her sister Gladys, and that the second proceeding should be barred under the doctrine of res judicata.

Pursuant to the stipulation (which was entered on the record in open court and incorporated in an order of the court dated Aug. 6, 1986), the following was agreed to and subsequently accomplished: the petitioner Marilyn Blaine was appointed committee for Florence, James Rudolph and his sisters reconveyed the house that they had inherited from their deceased aunt to Florence, Florence continued to reside in the house until the petitioner committed her to a nursing home, at which time the house was sold and the proceeds deposited

for Florence's care, and James rendered a full informal accounting of money and assets received and expended on behalf of Florence from the date of his mother's death. It was further agreed that Florence's assets would be distributed to the cousins upon her death, in equal shares.

In this second proceeding commenced over two years later, in August 1988, the petitioner, now in her capacity as Florence's committee, seeks injunctive relief and demands that James render a full accounting of all money and assets in his possession or over which he had exercised dominion or control, received either directly from his aunt or representing his aunt's funds transferred to him by his mother prior to her death. The application was based upon allegations that there was a "strong indication" that Gladys misappropriated her sister's funds during her lifetime and that those funds had largely come into James' hands. The Supreme Court denied the committee's application and this appeal ensued.

Since the express terms of the stipulation fail to define its scope, we must look to the intention of the parties at the time of its execution. James would have had no reason to relinquish valuable real estate other than to resolve the controversy regarding gifts between the sisters. He received no benefit other than the settlement of this controversy. There was no other quid pro quo. On the other hand, the petitioner recovered property on behalf of Florence (which was to be distributed after Florence's death among all nieces and nephews, the petitioner included) and had a committee designated. While the specific amounts and timing of the transfers between the sisters may not have been known by the petitioner at the time of the stipulation, the petitioner's inquiry into Florence's mental condition in years prior to 1985 at the hearing in 1986 must have been sparked by some awareness of prior transfers. The petitioner's intention to settle the pending proceeding in exchange for the receipt of the aforementioned benefits was reasonable, given the fact that other than the affidavit of the petitioner who noted signs of "forgetfulness * * * irascibility", and "memory lapses" when she visited her aunt from 1980 to 1983, no proof was presented that Florence was mentally incompetent during that period. Furthermore, it was uncontroverted that the sisters had lived together for years peaceably with Gladys solely responsible for Florence's physical care and financial management. Gifts made from Florence to Gladys would therefore not in and of themselves cause suspicion or surprise, particularly since Florence was childless and Gladys was not. For these reasons

I find that the circumstances surrounding the stipulation indicate that it was intended to settle the controversy concerning all transfers made from Florence to Gladys prior to the latter's death.

The remaining issue which must be addressed is whether the stipulation should be vacated. Strong public policy favors enforcing stipulations of settlement, and such stipulations are not to be cast lightly aside *(see, Matter of Dolgin Eldert Corp., 31 NY2d 1; Matter of Galasso, 35 NY2d 319)*. Strict enforcement of stipulations of settlement not only serves the interests of efficient dispute resolution but also is essential to the management of court calendars and the integrity of the litigation process *(see, Hallock v State of New York, 64 NY2d 224; Sontag v Sontag, 114 AD2d 892, 893)*. "Only where there is cause sufficient to invalidate a contract, such as fraud, collusion, mistake or accident, will a party be relieved from the consequences of a stipulation made during litigation *(Matter of Frutiger, 29 NY2d 143, 149-150)*" *(Hallock v State of New York, supra, at 230)*.

I fail to find evidence in this record to support the vacatur of this stipulation on grounds of fraud, collusion, mistake, or accident *(see, Matter of Frutiger, supra)*. Additionally, if the stipulation were to be set aside on the ground that the earlier transfers were not disclosed at the first proceeding, the parties should be restored to their status quo, the property conveyed by James transferred back to him, and the matter remitted for the court's determination of the validity of all transfers from Florence to Gladys.