Anita Terrace Realty LLC v Klein (2026 NY Slip Op 50025(U))

[*1]

Anita Terrace Realty LLC v Klein

2026 NY Slip Op 50025(U)

Decided on January 9, 2026

Civil Court Of The City Of New York, Queens County

Schiff, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on January 9, 2026
Civil Court of the City of New York, Queens County

Anita Terrace Realty LLC, Petitioner-Landlord,

againstSteve Klein, GUARINA TORRES, et al., Respondents.

Index No. L&T 80611-16/QU

Horing Welikson Rosen & Digrugilliers P.C. for Petitioner
JASA for Respondent Guarina Torres
Steve Klein, pro se

Logan J. Schiff, J.

BACKGROUND AND PROCEDURAL HISTORY
Petitioner commenced this licensee holdover proceeding upon filing the Petition on December 13, 2016, seeking to recover possession of 99-40 63rd Road, Apt. 7AA, Rego Park, New York 11374, from the remaining occupants following the death of the tenant of record, Aurora Torres, on March 1, 2014, upon expiration of her renewal lease on October 31, 2015. Ms. Torres was a non-purchasing, rent-stabilized tenant within a 536-unit complex that has been converted to cooperative ownership.
Respondent, Guarina Torres, interposed an answer through counsel on April 25, 2017, asserting a defense of succession rights. The answer alleges that Auroa Torres was Respondent's mother, that Respondent Torres, who was 70 years old as of the answer, was over 62 at the time of her mother's death, and has resided continuously in the premises since April 2012 with her son, Respondent Steve Klein, more than the one-year co-occupancy period required by law. The answer further notes that, upon the death of Aurora Torres, both Respondent Torres and her now deceased brother Julio Torres had independent succession rights to their mother's tenancy; however, per the answer, Julio passed away before their mother's lease expired, and therefore any succession rights he may have had never vested, notwithstanding Petitioner's assertion in the 10-day notice to quit acknowledging him as a successor.
The proceeding was marked off calendar for several years, during which the parties engaged in discovery as to Respondent's succession claim. It was further delayed by virtue of [*2]statutory stays occasioned by the COVID-19 pandemic following Respondent's filing a hardship declaration form (see NYSCEF 5-8), and well beyond the pandemic for reasons that are unclear to the court. The proceeding was ultimately restored to the calendar and transferred to the trial part upon Petitioner's motion by decision dated January 10, 2025 (NYSCEF 11-12), and then further prolonged following numerous adjournment requests by both sides and the bankruptcy filing of Petitioner's parent company the Pinnacle Group.
The court was finally able to conduct a substantive, pre-trial conference on October 15, 2025, during which Respondent Torres was present with counsel, along with her adult son, Respondent Steven Klein, who had never answered or otherwise formally appeared. During the conference, in response to inquiry from the court, Ms. Torres stated that she is the de facto legal guardian of her son following a traumatic brain injury he suffered in a car accident decades earlier, that he is physically and mentally disabled and unable to clearly recall events, and that he has lived in the premises continuously with her. Considering these representations, and based on its own observations, the court appointed a guardian ad litem (GAL) for Mr. Klein on consent by order dated November 13, 2025. The court further advised the parties that it would consider whether Respondent Klein had an independent succession claim during trial, notwithstanding his failure to answer.
A trial was conducted on December 10, 2025, December 18, 2025, and January 6, 2026.
THE TRIAL RECORD
The parties stipulated to Petitioner's prima face case, namely that the deceased tenant of record Aurora Torres was a non-purchasing, rent-stabilized tenant in a cooperative unit owned by Petitioner. As per the death certificate in evidence, Aurora Torres passed away on March 1, 2014, before her last two-year lease expired on October 31, 2015. The parties further stipulated that Respondent Guarina Torres, is the daughter of Aurora Torres, and that Respondent Steve Klein is Guarina's son, and Aurora's grandson.
Respondent, Guarina Torres, was the sole witness to testify in support of her succession defense. During her testimony, a birth certificate was admitted reflecting that she was born on XX XX, 1947, is presently 78 years old, and was 66 years old at the time her mother passed away on March 1, 2014. Respondent testified that she moved to the premises on April 12, 2012, prior to which she was living in Delaware Beach, Florida in a home she owned, along with her three adult children and several grandchildren, and worked at the Palm Beach County School Board. She stated she decided to move to New York after receiving a call from the 87th precinct advising her that her elderly mother, who lived alone and had dementia, was found roaming the streets unaccompanied. Respondent further testified that traveled to New York with her adult son, Steve Klein, who is presently 55 year sold and receives disability benefits, and for whom Respondent acts as a de facto legal guardian.[FN1]
According to Respondent Torres, Mr. Klein has lived with her and been under her exclusive care since he suffered a cerebral hemorrhage in [*3]college in or around 1998 as a result of a car accident, during which he was flung from the car, hit a tree, and was initially in a coma and not expected to survive. According to Ms. Torres, after awaking from the coma, Mr. Klein had to be retaught how to read and write and still suffers from short- and long-term memory loss, schizophrenia, and, according to doctors, has blood in his brain stem that prevents him from working or maintaining an independent life and requires Respondent Torres to act as his full-time caregiver.
Ms. Torres further testified that, upon returning to her mother's residence, she retrieved her brother Julio Torres, an alcoholic ex-marine who was living on a park bench, and brought him to the subject 3-bedroom apartment, to live with her, her son, and her mother. Respondent testified that she was not initially employed when she moved to the apartment, as she was mostly focused on caring for her mother who was often confused, belligerent, and required transportation to regular doctors' visits. Eventually, around January 2013, Respondent applied for a food license to run a restaurant in Brooklyn. Respondent stated that later, in mid-2013, she began substitute teaching for the New York State Department of Education, and she continued to do until her retirement in October 2022. A New York State certification teaching examination ticket, for an in-person exam on June 9, 2013, was admitted into evidence.
Respondent testified that, after her mother passed away, she wrote a letter to the landlord asking it to make her brother Julio Torres the successor tenant. She stated she prioritized him over herself "so he wouldn't be in the street," as he was a Vietnam Veteran who served his country but was not receiving benefits from the Department of Veteran's Affairs because he had lost his papers and who had two adult children of his own that were sleeping in a truck. The landlord agreed to make Julio a successor tenant upon renewal of the lease, however Julio passed away on July 18, 2015, before Respondent's mother's lease had expired. Respondent Torres then asked the landlord to make her a successor tenant, which they ultimately declined prior to commencement of this instant proceeding.
During Respondent's testimony, the court admitted into evidence medical records from Garden OB-GYN, stating that Ms. Torres has been a patient in the Queens practice since October 4, 2013, a record from AdvantageCare Physicians stating that she has been a patient since 2013, and medical records from Queens Long Island Medical Group enclosing blood and urine test results from August 9, 2013. Respondent stated that she had not changed her registered address with Medicare, her insurer provider, when she started seeing doctors regularly in New York, as she initially expected to return to Florida.
Respondent Torres consistently and credibly testified that she has resided full time in the subject premises in New York since April 2012. She stated that, initially, she and her son Steve would return regularly to Florida for short trips, approximately every two months, for his medical treatment at South County Mental Health, as she had difficulty finding an affordable, local doctor for him. Instead, it was cheaper to simply secure a $48 dollar, Spirit Airlines flight to Florida where Respondent Torres and her son could obtain 90-day prescriptions of his medications, which included Prozac, Benztropine, and two other medications that Mr. Klein eventually weaned off of and no longer takes.
During cross examination, Respondent conceded that she filed state taxes from 2013-2015 listing her home address as Florida. Respondent further acknowledged that her tax returns appeared to reflect that she took a homestead exemption on her Florida home, which she did not list for sale until late 2014 and did not ultimately sell until 2016. Respondent stated that she relied on her local Florida tax preparer to create these returns, who did not ask her where she was [*4]residing at the time, and that she did not review them closely.
Petitioner admitted additional medical records and pharmaceutical bills of Respondent's reflecting that although she received treatment in New York in 2014, she was still listing Florida as her home address. When queried, Respondent testified that all her doctors and medical providers were in New York following her move in 2012, and that she had simply not changed her address with Medicare or at Walgreens, a nationwide pharmacy with whom she already had created an account in Florida before moving.
Petitioner admitted several motor vehicle tickets and moving violations from 2014-2015 period, all incurred in the New York and New Jersey area, reflecting that Respondent's car remained registered in Florida. Respondent testified that the vehicle often remained in Florida for use by her other adult children, who continued to live in her Florida home through 2015, and that she therefore did not see the need to change the registration.
Respondent testified during cross-examination that she does not consider herself well off. When asked why she would then "carry" a home in Florida for over two years from 2012-2014 without listing it for sale if she was residing in New York, Respondent stated that her adult children and grandchildren were still using the home, so she did not initially focus on selling it to avoid putting them out on the street.
After Respondent Torres rested, the court called Respondent's son, Steve Klein, as a witness for purposes of ascertaining whether he may have an independent succession claim to the apartment. The court notified all parties, first at the pretrial conference and then at the outset of trial, that it felt obliged to undertake this inquiry in light of Mr. Klein's purported, psychological disability to avoid a potential unknowing waiver of succession rights. Mr. Klein testified that he considers himself disabled following a cerebral hemorrhage caused by a car accident many years ago while he was in college. He stated he receives $900 a month in government disability benefits. A copy of his Social Security disability award letter, produced by Ms. Torres following a continuance at the court's request, was admitted into evidence. Mr. Klein testified that he suffers from schizophrenia following his accident, that his mother handles all his finances and daily affairs and acts as his caregiver, and that he has always lived with his mother since his accident. Asked when he moved to New York, Respondent could not recall, initially saying he thought it was 27 years ago, but later acknowledging that he cannot recall dates and times clearly.
In rebuttal, Petitioner called Paul Reich, who testified that he is employed by Pinnacle Management (the parent company of Petitioner), and was the property manager of the Pinnacle-owned units at the subject cooperative complex from 2005-2024. He testified that he oversaw the staff managing the building, visited daily, and was familiar with the subject apartment, unit 7AA, in which Guarina Torres was the sole tenant and occupant listed on renewal lease forms. Mr. Reich stated that he only saw Respondent and her son in 2015 or 2016, after Guarina had passed away, and that he recalled being in the apartment at least one time in 2014, during which only Guarina Torres was present. He stated that he recalled a time when Julio Torres, Guarina's son, applied for succession and that, because management had at least occasionally seen him at the premises, there was sufficient evidence of co-residence to afford him succession rights. Mr. Reich said he would have done the same for Respondent Torres had her documentation supported a claim of succession.
Petitioner's final witness was Idriz Pepa. He testified that he was, until recently, the superintendent at the building for 21 years, including during the relevant time frame, that he was [*5]in the apartment for periodic repair visits and recalled seeing only Aurora Torres in the unit, and that he only observed the Respondents in the premises in 2014 or 2015, after Aurora passed away.
ANALYSIS AND DECISION
The sole determinative issue in dispute is whether Respondents are entitled to succeed to the subject rent-stabilized apartment pursuant to Rent Stabilization Code (9 NYCRR § 2523.5[b][1]).
A claim of succession rights is an affirmative defense to a holdover proceeding (see e.g. Shalimar Leasing, L.P. v Medina, 73 Misc 3d 22 [App Term, 2d Dept, 2d, 11th & 13th Jud Dists 2021]; Fieldbridge Assoc., LLC v Sanders, 70 Misc 3d 140 [App Term, 2d Dept, 2d, 11th & 13th Jud Dists 2021]). To succeed, an occupant must demonstrate, by a preponderance of the evidence, the requisite familial relationship with the tenant of record, which includes parents, children, grandparents, grandchildren and certain non-traditional family members (see Rent Stabilization Code [RSC] 2520.6[o]; 2523.5[b][1]), and co-residency for a one- or two-year period prior to the tenant's vacatur, the shorter timeframe applicable where the putative successor is disabled or elderly at the time of vacatur (see RSC 2523.5 [b][1]; Matter of Jourdain v New York State Div. of Housing & Community Renewal, 159 AD3d 41 [2d Dept 2018]).
As an initial matter, the court finds that relevant vacate date for its succession inquiry is March 1, 2014, the day the tenant of record Auroa Torres passed away based on the death certificate in evidence.[FN2]

With respect to Respondent Guarina Torres's succession defense, it is undisputed that she is presently 78 years old and was senior citizen at the time Aurora Torres passed away on March 1, 2014, and therefore need only show one year of co-residency with the tenant of record (see 550 Equities LLC v Washington, 67 Misc 3d 127 [App Term, 1st Dept 2020]). The parties likewise agree, and a birth certificate in evidence demonstrates, that Ms. Torres is the daughter of Auroa Torres, an eligible family member under the Rent Stabilization Code (see RSC 2520.6[o]). As such, the only remaining inquiry for the court is whether Ms. Torres utilized the subject premises as her primary residence during the period of March 1, 2013 to March 1, 2014 (see RSC § 2523.5[b][1]); Public Housing Law § 14[4][a]).
In determining primary residence, certain documents, including "driver's license, voter's registration, income tax returns, telephone records and bank statements," are particularly probative (see Fieldbridge Assoc., LLC v Sanders, 70 Misc 3d at *2-3) However, no one [*6]document is dispositive (id., citing 300 E 34th St. Co. v Habeeb, 248 AD2d 50 [1st Dept 1997]; RSC 2520.6[u]), and a "paucity of documentary evidence is not fatal to a valid succession claim where credible testimony evidence was presented at trial" (Sy v Doe, 4 Misc 3d 139 [App Term, 1st Dept 2004 (see Tesco V, LLC v Madden, 84 Misc 3d 134 [App Term, 2d Dept, 9th & 10th Jud Dists 2024]; 530 Second Ave. Co. LLC v Zenker, 160AD3d 160 [1st Dept 2018]); T & S Realty Corp v Lee, 49 Misc 3d 140 [App Term, 1st Dept 2015]; Lenoxville Assoc., L.P. v Downs, 40 Misc 3d 138 [App Term, 1st Dept 2013]; cf. 5539-181 & 182 Prospect Park W. Brooklyn, LLC v Caseres, 74 Misc 3d 128 [App Term, 2d Dept, 2d, 11th & 13th Jud Dists 2022]; 320 W. 49 LLC v Conliffe, 62 Misc 3d 143 [App Term, 1st Dept 2018]).
Here, the court credits Respondent's testimony as establishing that she moved from Florida to the subject premises in April 2012, along with her disabled, adult son, Steve Klein, to care for her elderly mother Aurora Torres, who was experiencing dementia and was found by the NYPD wandering in the street alone. Respondent's detailed, composed, and internally consistent testimony, was bolstered by modest documentary evidence, including medical and pharmaceutical records reflecting that she began receiving treatment in Queens as of at least August 2013. The court also admitted into evidence an in-person, New York State Teacher Certification Examination admission ticket dated June 9, 2013, consistent with Respondent's testimony that she eventually sought part time employment as a substitute teacher after getting settled in New York, behavior more characteristic of a full-time resident than a temporary guest.
While Petitioner established during cross-examination that Respondent filed taxes listing her Florida address as her primary residence from 2013-2015, continued to register her car in Florida, and did not change her home address with her medical providers, none of this paperwork proves that Respondent was physically living in Florida during the relevant period, nor is the use of the Florida address on tax returns and motor vehicle records logically incompatible with an otherwise credible succession claim (see Glenbriar Co. v. Lipsman, 11 AD3d 352 [1st Dept 2004], aff'd on other grounds 5 NY3d 388 [2005]); Matter of 92 Cooper Assc. v. Roughton-Hester, 165 AD3d 416, 417 [2nd Dept 2018]; Zevrone Realty Corp. v Irving, 63 Misc 3d 141 [App Term, 1st Dept 2018]; Sixth Lenox Terrace Assoc. v Poney, 899 NYS2d 63 [App Term, 1st Dept 2009]; cf. Matter of Ansonia Assoc. L.P. v Unwin, 130 AD3d 453 [1st Dept 2015]). Furthermore, Respondent plausibly explained these discrepancies and her reason for retaining property in Florida through her testimony, namely that she had other adult children and grandchildren residing in her Florida home when she left for New York, which she listed for sale in 2014 and ultimately sold in 2016, that she relied on her accountant to complete her tax filings, who did not ask her if she had relocated, and that she primarily left her car in Florida for her other adult children's use. Notably, all the documents admitted during cross-examination, including parking tickets and motor vehicle violations, as well as medical and pharmaceutical records, show Respondent physically present within the New York area, rather than Florida, notwithstanding her failure to change her listed address with the relevant agencies.
While the documentary evidence may suggest that Respondent did not initially plan to relinquish her Florida residency when she moved to New York in 2012 to care for her ailing mother, as the appellate courts have repeatedly noted: "Regulations providing for succession rights serve the important remedial purpose of preventing dislocation of long-term residents due to the vacatur of the head of household" and "should be liberally construed to carry out the reform intended and spread its beneficial effects as widely as possible" (Matter of Jourdain, 159 AD3d 41 [2d Dept 2018]); Festa v Leshen, 145 AD2d 49 [1st Dept 1989]; Lesser v Park 65 [*7]Realty Corp., 140 AD2d [1st Dept 1988]). Bearing this in mind, this court's succession determination must be dictated by where Respondent actually, primarily, physically resided during the relevant period, not what her intent may have been when she first moved from Florida or the address she used on certain non-dispositive documents (see Tres Realty LLC v Ta-Wei Yu, 63 Misc 3d 28 [App Term, 1st Dept 2019]). Here, the weight of the evidence reflects that Respondent Torres primarily resided at the subject premises during the relevant one-year period of March 2013-March 2014, not at the home she owned in Florida during this time.
The fact that Respondent concedes upon the death of her mother she sought succession rights for her brother Julio, rather than herself, does not undermine her succession claim. Respondent credibly testified that she did not realize multiple household members could simultaneously succeed to a rent-stabilized apartment, and that she therefore prioritized her brother, a disabled Vietnam war veteran, who had been living on a park bench when she returned from Florida. After Respondent's brother died on June 18, 2015, prior to both the expiration of Respondent's mother's lease on October 31, 2015, and his signing of any renewal lease, the record reflects that Respondent promptly sought succession rights in her own name.
Nor did Petitioner rebut Respondent's prima facie showing of succession rights. Petitioner's two witnesses were the former managing agent and the former superintendent of the non-purchasing units held by Pinnacle Group at the subject 536-unit, cooperative complex.[FN3]
 Both witnesses offered largely generalized testimony of their recollections in regards to their fleeting interactions at subject apartment, one of presumably many units subject to their oversight during the 2013-2014 period, over a decade ago, as to who was occupying the apartment during the relevant period, including during sporadic unspecified repair visits. The testimony, unsupported by documentary or other non-testimonial evidence, was "hardly dispositive" as to Respondent's residence (Rose Assocs. v. Div. of Housing & Community Renewal, Office of Rent Admin, 121 AD2d 185, 18 [1st Dept 1986]; Patchin Place v. Fox, 787 NYS2d 679, 679 [App. Term, 1st Dept 2004]) and does not preponderate over Respondent's fact-laden testimony and documentation as to her residence during the relevant period. Accordingly, as the preponderance of the evidence demonstrates that Respondent primarily resided at the subject premises during the relevant period of March 1, 2013 to March 1, 2014, Respondent has demonstrated she is a successor tenant entitled to a renewal lease, not a licensee as asserted in the Petition.
The court now turns to the succession defense of co-Respondent Steve Klein, who all parties agree is Respondent Torres's son and the grandson of the former tenant of record. Mr. Klein, who has not retained counsel and never formally interposed an answer, sat quietly by his mother's side throughout the proceeding, smiling yet seemingly displaying little comprehension of the stakes involved or the fact that he might have independent rights to the apartment. Regrettably, and yet commonplace in housing court, where the needs of the disabled are often overlooked in the frenzy of a fast-paced, high-volume practice, at no point prior to the pre-trial conference (PTC) in October 2025, nine years after this proceeding was commenced, did either side inform the court of Respondent Klein's readily discernable cognitive disability. This fact was only ascertained upon the court's own inquiry at the PTC, during which Mr. Klein sat passively beside his mother, and resulted in the court's sua sponte appointment of a GAL for Mr. [*8]Klein.
As the court noted to the parties during the pre-trial conference, and at outset of the trial, to the extent Respondent Torres avers that Mr. Klein has always co-resided with her under her care, Respondent Klein has set forth a colorable succession defense independent of his mother's, and the pleadings are hereby amended, sua sponte, to conform to the proof to raise such an affirmative defense, even in the absence of a written answer (see 2070 LLC v Cuesta, 87 Misc 3d 133 [App Term, 1st Dept 2025]; Thanasoulis v Shapiro, 81 Misc 3d 132 [App Term, 1st Dept 2023; Wooten v State, 302 AD2d 70 [4th Dept 2002]; Murray v New York, 43 NY2d 400 [1977]). Consideration of Mr. Klein's succession defense is necessary in the interest of justice insofar as a claim for succession may be waived where not timely asserted, and Mr. Klein has seemingly professed an interest in continuing to live in the premises with his mother, his primary caregiver (see Matter of 901 Brklyn Realty, LLC v Manigat, 239 AD3d 640 [2d Dept 2025]).
With respect to the relevant co-occupancy period, the court finds that Respondent Klein, a 55-year-old man who does not work and is entirely dependent on his mother's care to function since suffering a life-altering traumatic brain injury in college decades ago, meets the definition of a disabled individual under the Rent Stabilization Code 2523.5(b)(5), which defines disability as including physical and psychological conditions that "are expected to be permanent and which substantially limit one or more of such person's major life activities" (id.). This conclusion is based on the testimony of Respondent's mother Ms. Torres, Respondent Klein's Social Security disability award letter,[FN4]
and the court's observations of Respondent Klein during his own testimony (see Kalimian v Driscoll, 1991 NY Misc. LEXIS 845 [App Term, 1st Dept 1991]).[FN5]
[*9]Therefore, Mr. Klein need only show one year of co-residency with his grandmother to succeed (see RSC 2523.5[b][1]), specifically for the period March 1, 2013 through March 1, 2014. As the preponderance of the evidence demonstrates that Respondent Klein has always and continues to reside exclusively with his mother, and the court has already concluded that Respondent Torres moved to the premises in April 2012, well over a year before Aurora Torres died on March 1, 2014, Respondent Klein has established his succession rights to the subject apartment.
CONCLUSION
The weight of the evidence demonstrates that Respondents Torres and Klein are rent-stabilized successors entitled to a renewal lease in both their names. As rent-stabilized successors are not properly characterized as licensees, this licensee holdover Petition is hereby dismissed after trial. The clerk is directed to enter a judgment of dismissal in Respondents' favor.
This constitutes the decision and order of the court.
Dated: January 9, 2026
Queens, New York
Hon. Logan J. Schiff, J.H.C.

Footnotes

Footnote 1:Respondent initially testified that she became Mr. Klein's legal guardian in 1999. However, after the court asked Respondent to produce proof of such in between continued court dates, Respondent returned and testified that upon reviewing her records she now realized she had misspoken and never ultimately completed the legal guardianship process, instead only seeking disability benefits for her son.

Footnote 2:While Petitioner's 10-day notice to quit, incorporated into the Petition by reference, states that Aurora Torres's son Julio Torres subsequently succeeded to the apartment, the record demonstrates that he passed away on June 18, 2015, prior to the expiration of Auroa's lease on October 31, 2015, and never executed a renewal lease in his name. Under these circumstances, any inchoate succession rights Julio Torres may have had in the apartment never vested (see Matter of 901 Brklyn Realty, LLC v Manigat, 239 AD3d 640 [2d Dept 2025]). To the extent Petitioner's assertion that Julio Torres was the last tenant of record could be construed as a material misstatement that might warrant dismissal on motion (see Jamaica Seven v Villa, 67 Misc 3d 138 [App Term, 2d Dept, 2d, 11th &13th Jud Dists 2020]), no party has made such a claim, choosing instead to chart a succession rights determination course, and the court declines to do so sua sponte in this 10-year-old matter.

Footnote 3:The court takes judicial notice of the Department of Housing Preservation and Development's website's information as to the total number of apartments in the premises.

Footnote 4:The Social Security disability award letter in evidence states that Respondent was adjudicated disabled as of 1990. While Respondent Torres testified that her son became disabled in or around 1998, the court does not find this discrepancy to be material (see Matter of Verille v Gardner, 177 AD3d 1068 [3d Dept 2019]; People v Silva, 306 AD2d 424 [2d Dept 2003]).

Footnote 5:The court called Mr. Klein as a witness, questioned him as to the nature of his disability, and asked his mother, Ms. Torres, to procure proof of his Social Security disability benefits. This level of proactive engagement is not preferable for a judge, who must maintain impartiality and is generally ethically barred from advocating for either side (see Rossmill Assoc., LP v Watanabe, 83 Misc 3d 319 [Civ Ct, NY Co 2024]). However, the court likewise cannot shut its eyes to the needs of the disabled and allow an individual with a major cognitive impairment to unwittingly forfeit a defense so fundamental as succession rights under the guise of objectivity (see Thanasoulis v Shapiro, 81 Misc 3d 132 [App Term, 1st Dept 2023); Jamsol Realty, LLC v German, 997 NYS2d 891 [App Term, 2d Dept, 2d, 11th & 13th Jud Dists 2014]; Shad v Shad, 167 AD2d 532 [2d Dept 1990]). Nor can a judge simply take solace in the appointment of a GAL and presume that this alone is sufficient to ensure substantial justice is achieved. Most GALs are not attorneys and do not have the technical skills to defend their wards' interests at trial in contested holdovers, often rendering the appointment of a GAL without counsel for a mentally incapacitated person more of "a pro forma protection allowing the eviction process to go forward with all parties involved, including the court, complicit in allowing a fig leaf to cover up the inadequacy" in what is effectively an "attempt to fill a sizeable gap in social services with a moral salve rather than a practical solution" (700 Brooklyn Realty LLC v Forsythe, 86 Misc 3d 1250 [Civ Ct, Kings Co 2025]). Frequently, the most impactful thing a GAL can accomplish is securing counsel (see Matter of Anderson Ave. Assoc. LP v Fuller, 238 AD3d 401 [1st Dept 2025]). However, there is, at present, no statutory or constitutional right to counsel in housing court, only the New York City-funded, universal access to counsel program (UAC), passed by Local Law 136 in 2017, which offers access to free legal services for individuals with incomes below 200% of the federal poverty guidelines (see 2247 Webster Ave. HDFC v Galarce, 62 Misc 3d 1036 [Civ Ct, Bronx Co 2019], citing Administrative Code of City of New York § 26-1302[a][2]). When Local Law 136 was enacted, it had a stated goal of securing full representation in housing court for all low-income tenants by June 1, 2021 (see NYC Admin Code § 26-1302[a][2][b]). Yet, despite a significant increase in the percentage of tenants receiving counsel since 2017, many eligible tenants remain pro se, with only 44% of all tenants (including higher incomes tenants) receiving full legal representation in the fourth quarter of 2025, according to recent court data (FY25 Annual Report at 30, New York City Office of Civil Justice, available at https://www.nyc.gov/assets/hra/downloads/pdf/services/civiljustice/OCJ_Annual_Report_2025.pdf [last accessed Jan. 8 2026]). This large swath of unrepresented individuals unquestionably includes many low-income individuals with psychological disabilities for whom the court has seen fit to appoint GALs. In fact, such tenants, like Mr. Klein, have routinely appeared without counsel in trials before the undersigned, even where the court has made a direct referral for assigned counsel to the Office of Civil Justice, the division within the City's Human Resources Administration that is responsible for overseeing UAC. Many such cases involve complex proceedings in which long-term, rent regulated housing is at stake, forcing the court to straddle an uncomfortable line between arbiter and advocate. If UAC's lofty goal of full representation for all low-income New Yorkers remains elusive, ensuring representation for the most vulnerable populations, particularly those for whom a GAL has been appointed, is, in the eyes of the undersigned, a necessary interim measure for achieving equal justice in housing court.